1

2

3

4

5

6

7

8

9                    IN THE UNITED STATES DISTRICT COURT

10                       FOR THE DISTRICT OF OREGON

11                          PORTLAND DIVISION

12   BRIDGET DAVIS, Guardian ad      )
     litem for BRIANNE DAVIS, an     )
13   incompetent person,            )
                                    )
14                    Plaintiffs,   )    No. CV-09-1488-HU
                                    )
15        v.                        )
                                    )
16   WAL-MART STORES, INC., a       )
     foreign corporation, dba       )    FINDINGS & RECOMMENDATION
17   WAL-MART,                      )
                                    )
18                    Defendant.    )
     ───────────────────────────────)
19
     Craig A. Crispin
20   CRISPIN EMPLOYMENT LAWYERS
     1834 S.W. 58th Avenue, Suite 200
21   Portland, Oregon 97221

22        Attorney for Plaintiffs

23   Richard R. Meneghello
     Elizabeth K. Bonucci
24   FISHER & PHILLIPS LLP
     111 S.W. Fifth Avenue, Suite 1250
25   Portland, Oregon 97204

26        Attorneys for Defendant

27   HUBEL, Magistrate Judge:

28        Plaintiff Bridget Davis brings this disability discrimination

1 - FINDINGS & RECOMMENDATION

action as guardian ad litem for her daughter, plaintiff Brianne Davis, against defendant Wal-Mart Stores, Brianne Davis's former employer.[1]  Defendant moves for summary judgment.  I recommend that the motion be granted as to the wage claim, and denied as to the disability discrimination claims.

BACKGROUND

Plaintiff is a low-functioning developmentally disabled individual who has been classified as "mildly retarded" with "borderline intellectual functioning."  Plaintiff worked for defendant from November 2006 through mid-May 2008.  She began in the Wood Village, Oregon store as an "Associate" in the men's clothing department.  Assistant Manager Stephanie Kime hired plaintiff, who was accompanied to the interview by a job coach from the state's vocational rehabilitation agency because of plaintiff's developmental disabilities.

As a menswear Associate, plaintiff's job responsibilities included ensuring the clothing items were hung, folded, and kept straight, and keeping the department generally orderly and clean.  Defendant allowed plaintiff's job coach to accompany her to work the first few shifts to assist her in learning how to perform her position.

In deposition, David Fuller, the Wood Village store manager, explained defendant's discipline policy.  Exh. 5 to Meneghello Declr. (Kime Depo.) at p. 7; Exh. 6 to Meneghello Declr. (Fuller

---

[1]  Although there are two plaintiff's, the facts and claims relate primarily to Brianne Davis.  My references to plaintiff in the singular are to Brianne Davis.  When necessary to distinguish between the plaintiffs, I refer to Bridget Davis or Brianne Davis by first name only.

Depo.) at pp. 75-78. There are three levels of discipline. Level 1 is a "Verbal Coaching," which is a "documented verbal discussion." Fuller Depo. at p. 75-76. Level 2 is a "Written Coaching," where the issue is written "into the system with a witness," with documentation regarding "what the violation was and how to correct it and how to cure it." Id. at p. 76. Both Level 1 and Level 2 last for one year. Id. at pp. 75-76. The fact that different conduct may be at issue is not relevant to the issuance when of a Level 2 if an Associate is within the one-year window of Level 1. Id. at pp. 76-77. For example, if an Associate receives a Level 1 verbal warning for not stacking shelves correctly, and then, within one year, violates a different policy, it results in a Level 2 "Written Coaching" discipline. Id.

Level 3 is called "Decision-Making Day." Id. at p. 77. Defendant pays the Associate for the day and the next scheduled day off, but the Associate does not work and instead, uses the time to "think about and write a plan of action on how [he or she is] going to conduct [him or her]self performance-wise or attendance-wise, depending on how it is." Id. Level 3 also lasts one year. Id. Any problems warranting discipline occurring within one year of receiving a Level 3 "Decision-Making Day" discipline, result in automatic termination. Id. at p. 78.

Kime was an assistant manager at defendant's Wood Village store from September 2006 to September 2007. Kime Depo. at p. 6. At some unidentified time, Kime had concerns about plaintiff's work performance. Id. at p. 18. Plaintiff's performance was inconsistent and there were times she was not performing all the duties she needed to perform in a timely manner. Id. She spent a

3 - FINDINGS & RECOMMENDATION

1   lot of time talking with other Associates.   _Id._   Kime heard from

2   Laura Broomfield, plaintiff's immediate "hourly supervisor," who

3   was in charge of the menswear section, that when Broomfield came in

4   to open after plaintiff had closed, the "zone wasn't good, the

5   claims weren't done properly, things like that."   _Id._ at p. 29.

6   Kime asked plaintiff to contact plaintiff's job coach to have her

7   come to the store so they could talk about plaintiff's performance.

8   _Id._ at pp. 17-18.   Kime does not remember if the job coach actually

9   came in.   _Id._   A statement submitted by defendant to the Bureau of

10  Labor and Industries (BOLI), indicates that the job coach came to

11  the store in February 2007.   _Id._ at p. 43 (Kime shown the

12  statement, but it did not trigger her recollection of the job coach

13  returning to the store).

14      On April 15, 2007, Kime issued plaintiff a Level 1 Verbal

15  Coaching discipline.   Exh. 1 to Roeder Declr.   The reason listed is

16  "job performance."   In the narrative, Kime wrote

17      Brianne is very inconsistent from day to day in her job
        performance.   On 4/15/07 for example she was observed
18      wandering off to another dpt. and talking with an
        associate.   She spends too much time at the fitting room
19      when she should be zoning her area.   She also needs to
        pay attention to respect for the individual. When she is
20      confronted about not completing her assigned duties she
        makes inappropriate comments under her breath and
21      displays a poor attitude.

22  _Id._

23      The documentation also notes the expected behavior, the next

24  level of action if the behavior continued, the date, time, and

25  place of coaching, and the expiration date.   _Id._   An electronically

26  generated check mark indicates an acknowledgment of the document by

27  both Kime and manager Vitaliy Ploshchinskiy.   _Id._

28      In her deposition, Kime explained the narrative's statement

4 - FINDINGS & RECOMMENDATION

about plaintiff making inappropriate comments. Kime indicated that on one occasion, she heard plaintiff mumble the word "fuck," under her breath.  Kime Depo. at pp. 44, 47-48.

Kime also explained that in issuing this discipline, she brought plaintiff into her office and they viewed the written "Verbal Coaching," on the computer. Id. at p. 22. They discussed the issues that occurred, and "what we need to do to help the situation," including asking if there was anything defendant could do to help her improve. Id. Because it was a "Verbal Coaching," it did not have to be formally acknowledged by the Associate. Id.

According to Bridget, plaintiff's vocational rehabilitation services expired "probably in the spring of 2007." Exh. 8 to Meneghello Declr. (Bridget Davis Depo.) at p. 17.

Kime continued to supervise plaintiff until Kime left to work at another store in August 2007. Kime Depo. at p. 25. She recalled no specific performance problems during the time between the April 2007 Verbal Coaching and her departure. Id. Cathy Roeder became plaintiff's supervisor at that time. Id.

Roeder observed that plaintiff did not always do a good job with zoning and cleaning. Exh. 7 to Meneghello Declr. (Roeder Depo.) at p. 9. Roeder had to show plaintiff things that Roeder wanted her to do. Id. Roeder had to remind plaintiff more than once about how to do things. Id. She provided training to plaintiff in the form of "verbally communicating with her in regards to what needed to be done, how to do it." Id. at p. 19. Roeder was critical of the quality of plaintiff's work, the completion of her work, and her attitude. Id. at p. 20.

Plaintiff received an annual performance appraisal on October

5 - FINDINGS & RECOMMENDATION

3, 2007. Exh. 3 to Crispin Declr. (Depo. Exh. 15 to Roeder Depo.) at pp. 34-35. It was signed by plaintiff, Roeder, and store manager Rick Skarpac. Id. at p. 35. The first page consists of a checkmark assessment of various duties. Id. While the duties are legible, the boxes with the checkmarks are shaded and are difficult to read. The three assessment categories are completely obscured by the shading. The categories likely are something such as "exceeds expectations," "meets expectations," and "needs improvement," but that is largely supposition. It appears that plaintiff received several checks in the middle category, and others are unknown. There appear to be some scratch outs.

The narrative section is clear. Under strengths, it states: "Brianna [sic is []] good at following instructions and does her best at all times. She strives to learn things and is proud of her accomplishments." Id. at p. 35; Roeder Depo. at p. 27. Under areas for improvement, Roeder wrote: "Brianna needs to show more of a sense of urgency to better serve our customers. I would like to see Brianna take [the] opportunity to be a better zoner." Id. In the employee comment/goal setting section, it is written (unclear by whom): "[t]ry to get all returns put away and zone up my whole department 100%. Get all the claims done." Id. Finally, there is an overall checkmark assessment of "meets expectations." Id.

On October 18, 2007, Roeder issued a Level 2 "Written Coaching" to plaintiff for violating defendant's break and meal period policy. Roeder Declr. at ¶ 3. Plaintiff failed to clock out for her required meal period. Id. The written documentation states that on October 6, October 9, and October 11, 2007,

6 - FINDINGS & RECOMMENDATION

plaintiff did not clock out for her required meal period, even though she took her meal period. Exh. 2 to Roeder Declr. The document includes a statement regarding expected behavior, a statement that the next level of action if the behavior continues is a Decision Day, and indicates the issuance date of October 17, 2007, and the expiration date of October 18, 2008. Id. Plaintiff, Roeder, and manager Suzanne Schey electronically checked acknowledgments of the "Coaching." Id.

Defendant's meal and break policy provides that Associates will be subject to discipline for failing to clock out for meal periods, for missing breaks, or taking breaks that are too long, too short, or untimely. Exh. 3 to Roeder Declr. at p. 4. It is a four and one-half page policy. Id. The policy indicates that where state law requires additional or more frequent breaks or meal periods than defendant's policy, state law is followed. Id. at p. 3. However, if defendant's policy is more generous, it applies. Id.

Fuller testified in deposition that Oregon has a "very complicated meal exception law." Exh. 8 to Crispin Declr. (Fuller Depo.) at p. 41. Store manager Skarpac explained that in Oregon, the meal policy has three parts: if the employee works a shift no longer than 5 hours, 59 minutes, the employee does not get a meal period. Exh. 9 to Crispin Declr. (Skarpac Depo.) at p. 25. Employees who work between 6 hours and 6 hours, 59 minutes, get a meal period which must be taken after the second hour and before the fifth hour. Id. at pp. 25-26. Employees who work a shift of 7 hours or more, get a meal period which must be taken after the third hour and before the sixth hour. Id. at p. 26. Breaks are

7 - FINDINGS & RECOMMENDATION

1  paid, and are encouraged to be taken every two hours.  Id.

2      On November 8, 2007, Roeder issued a Level 3 "Decision-Making

3  Day" coaching discipline to plaintiff.  Roeder Declr. at ¶ 4; Exh.

4  4 to Roeder Declr.  In her declaration, Roeder explains that she

5  issued the "Decision-Making Day" discipline because plaintiff's

6  work performance continued to suffer.  Roeder Declr. at ¶ 4.

7  Plaintiff was not productive with her nightly tasks and had a

8  negative attitude when approached by other Associates or

9  management.  Id.

10      The written "Decision-Making Day" document states that

11  plaintiff had "not been productive in keeping up with her required

12  nightly tasks:  zoning, go-backs and housekeeping in her assigned

13  areas are not being completed in a timely manner."  Exh. 4 to

14  Roeder Declr.  Additionally, "when approached by other Associates

15  or management her attitude has been negative in response."  Id.

16  The expected behavior is noted, as well as the November 8, 2007

17  issuance date, and the November 9, 2008 expiration date.  Id.

18  Termination is noted as the next level of action if behavior

19  continued.  Id.  Electronic check marks for both plaintiff and

20  Schey acknowledge the action.  Id.

21      The document contains a section for "action points/Associate's

22  comments" which states: "work at doing better, being more

23  productive, and having a good attitude, but tell manager when you

24  need help."  Id.  In the section where the checkmarks appear,

25  entitled "Coaching Acknowledgments Finalized By:," the checkbox is

26  marked next to this phrase:  "I have completed the Action Points

27  and will exhibit the expected behavior in the future."  Id.  This

28  indicates that it has been completed by the Associate.  Id.

8 - FINDINGS & RECOMMENDATION

1    As noted above, the "Decision-Making Day" discipline includes
2    paying the employee for a day off so the employee can "kind of
3    regroup at home and come up with a plan of action."  Exh. 3 to
4    Crispin Declr. (Roeder Depo.) at p. 31.  "[W]e ask them to write
5    out what they can do so they can come back and do an adequate job
6    of what Wal-Mart is asking of them."  Id.  Roeder could not recall
7    if plaintiff was asked to do this, nor could recall seeing a plan
8    prepared by or on behalf of plaintiff.  Id.

9    Plaintiff states that she was asked to create an action plan,
10   but she did not do so because at the time, she did not know what an
11   action plan was.  Exh. 4 to Crispin Declr. (Pltf Depo.) at p. 71.
12   Neither her supervisor, nor manager ever asked her where her action
13   plan was.  Id.

14   Roeder states that she felt that her own efforts and continual
15   training to help plaintiff become a success were not working, and
16   that plaintiff appeared unable to perform the required tasks for
17   the menswear position.  Roeder Declr. at ¶ 5.  Roeder then
18   reassigned plaintiff to the fitting room, a more simple and less
19   strenuous job assignment.  Id.  She hoped the new position would be
20   a better fit, and that plaintiff would be able to perform the
21   required duties.  Id.  The date or time period that this occurred
22   is unclear from her declaration, although based on the
23   chronological nature of the statements in her declaration, and the
24   placement of this paragraph following the paragraphs discussing the
25   October 2007 and November 2007 disciplines issued to plaintiff, I
26   assume the transfer to the new position occurred after November
27   2007.

28   In her deposition, Roeder notes that she had plaintiff working

9 - FINDINGS & RECOMMENDATION

at the fitting room at one point, answering phones, assisting customers, and keeping the fitting room clean, but again she does not give a date. Roeder Depo. at p. 20. She states that in this position, she would quite often find plaintiff laying her head and arms on the counter rather than working. Id.

After the November 8, 2007 "Decision-Making Day" discipline, plaintiff called her mother and asked Bridget to speak with Roeder, which Bridget did. Exh. 8 to Meneghello Declr. (Bridget Davis Depo.) at p. 20. This was the first contact Bridget had with Roeder. Id. In this conversation, Roeder told Bridget that plaintiff was being put on an action plan because she was having difficulty getting her work done, and that plaintiff was being moved to the fitting rooms. Id. According to Bridget, Bridget told Roeder that plaintiff had special needs, and she inquired as to whether it was necessary for her (Bridget) to make a written formal request to defendant for reasonable accommodation under the "ADA." Id. Bridget testified that Roeder told her that such a formal request was not necessary. Id.

Bridget also testified that she told Roeder that at that time, Bridget was plaintiff's job coach and that if there was anything that came up that needed to be addressed, Bridget needed to be notified, whatever the circumstances. Id. Bridget states that Roeder said she would contact Bridget. Id. at p. 22. But, Bridget states, Bridget did not speak with Roeder again until the day plaintiff was terminated. Id.

Fuller explained that generally, in the absence of a request for accommodation, an employee with a mental disability is treated the same as an employee with no such disability. Exh. 8 to Crispin

10 - FINDINGS & RECOMMENDATION

Declr. (Fuller Depo.) at p. 49.  At Wal-Mart, the process by which
an Associate requests an accommodation is to approach a salaried
member of management who will give the Associate a "reasonable
accommodation packet," which the Associate completes, indicating
what he or she needs a reasonable accommodation for, and which then
gets faxed to defendant's home office in Bentonville, Arkansas.
Id.; see also Exh. 7 to Crispin Declr. (Mark Pelham Depo.) at p. 22
(stating that packet went to "ADA department" at the "home office"
in Bentonville).   A manager can also initiate the process by
approaching the Associate and giving them the "ADA packet" to get
them started in requesting an accommodation.  Id. at p. 52.  Fuller
is unaware of anyone giving plaintiff a reasonable accommodation
packet.  Id. at pp. 52-53.  According to Fuller, when a manager
receives an oral request for accommodation from an Associate, the
manager is supposed to report that request to the personnel manager
or the store manager, in order to obtain the packet.  Id. at pp.
69-70.  Fuller does not recall any communication, whether email,
written, or oral, with any of his subordinates concerning the
possible need for accommodation for plaintiff.  Id. at p. 52.
Roeder did not initiate a reasonable packet request on behalf of
plaintiff.  Exh. 3 to Crispin Declr. (Roeder Depo.) at pp. 55-56.

Mark Pelham appears to have been the "HR Market Manager" for
the Wood Village store.  Exh. 7 to Crispin Declr. (Pelham Depo.) at
p. 16.  He has human resources responsibilities for a certain
"market," meaning geographic area.  He explained that he did not
have the authority to grant reasonable accommodation requests, that
such decisions were not made at the individual store level, and
that if there was a request, the employee was given an "ADA

11 - FINDINGS & RECOMMENDATION

1  packet." Id. at pp. 23-24.

2      Fuller confirmed that reasonable accommodation decisions are
3  made at the corporate level.  Exh. 8 to Crispin Declr. (Fuller
4  Depo.) at p. 50.  At the store level, a manager may try to "tweak"
5  an Associate's schedule due to something going on in their life,
6  but, as Fuller said, "in terms of request for a stool or anything
7  like that, no, that has to go through the ADA office." Id. at p.
8  51.  None of the managerial employees who were deposed in this case
9  were familiar with the term "good faith interactive process."  Exh.
10  2 to Crispin Declr. (Kime Depo.) at p. 39; Exh. 3 to Crispin Declr.
11  (Roeder Depo.) at pp. 58-59; Exh. 7 to Crispin Declr. (Pelham
12  Depo.) at p. 18; Exh. 8 to Crispin Declr. (Fuller Depo.) at p. 80.

13      If the Associate fails to return the "ADA packet," defendant
14  does not follow-up with the accommodation request.  Id. at pp. 68,
15  70.

16      Roeder has a vague memory of being told that she could not
17  call Bridget and divulge information about plaintiff to Bridget
18  because plaintiff was eighteen and Bridget had no legal authority
19  over plaintiff.  Exh. 3 to Crispin Declr. (Roeder Depo.) at pp. 36-
20  42.  Roeder does not recall whether she was told this information
21  by Fuller or Pelham, or how the process of obtaining that
22  information was initiated.  Id.  She believes the information
23  ultimately came from "legal."  Id.; see also Exh. 6 to Crispin
24  Declr. (defendant's position statement to BOLI explaining that
25  Roeder became concerned about the propriety of discussions about
26  plaintiff's job with Bridget and discontinued affirmatively calling
27  Bridget).

28      Plaintiff was terminated on or about May 7, 2008.  Exh. 5 to

12 - FINDINGS & RECOMMENDATION

1    Roeder Declr. (May 13, 2008 Exit Interview form showing last day
2    worked as May 7, 2008).    Roeder states that plaintiff was
3    terminated because she again violated the break and meal period
4    policy and because she was already on "final warning."    Roeder
5    Declr. at ¶ 6.    The Exit Interview form states that plaintiff was
6    terminated because she received a meal violation and already had a
7    "decision day."    Exh. 5 to Roeder Declr.    The box for "Misconduct
8    w/Coachings" is checked.    <u>Id.</u>    It appears under the category of
9    "involuntary termination," but "eligible to re-apply."    <u>Id.</u>
10   Another box for "re-hire recommended" is also checked.    <u>Id.</u>  The
11   form is signed by plaintiff and Roeder and one other person whose
12   signature is illegible, on May 13, 2008.    <u>Id.</u>

13        Bridget states that at the time Roeder terminated plaintiff,
14   plaintiff called Bridget, very, very upset, and gave the phone to
15   Roeder who told Bridget that plaintiff was being terminated.    Exh.
16   5 to Crispin Declr. (Bridget Davis Depo.) at p. 23.    Bridget asked
17   Roeder why Bridget had not known "that this was a problem," because
18   Bridget had previously asked Roeder to call her if there was an
19   issue of any type.    <u>Id.</u> at p. 24.    In her deposition, Bridget
20   testified that she did not recall that Roeder said anything in
21   response.    <u>Id.</u> at pp. 24-25.    In a declaration, she states that
22   Roeder told her that defendant had changed its policy about
23   contacting Bridget and that because plaintiff was over eighteen and
24   an adult, defendant would talk only to plaintiff.    Bridget Declr.
25   at ¶ 3.    Bridget indicates that she was not previously informed of
26   the decision to not contact her, and Roeder's testimony is unclear
27   as to whether she talked to Bridget about this at any time other
28   than the termination.    Bridget Declr. at ¶ 3; Exh. 3 to Crispin

13 - FINDINGS & RECOMMENDATION

Declr. (Roeder Depo.) at pp. 36, 44, 55.

After her termination, plaintiff applied for and received social security disability (SSD). In an undated "Vocational Decision Worksheet," the Social Security Administration (SSA) indicated that plaintiff was incapable of performing any past relevant work, Exh. 2 to Meneghello Declr.[2] Boxes under the category "MRFC" (mental residual functional capacity), are checked for understanding/memory, concentration/pace, social interaction, and adaptation. Id. The document also indicates that plaintiff was "not capable of performing other work, considering medical impairments, RFC and/or MRFC, age, education, and work experience." Id.

In a September 17, 2008 MRFC completed by Megan D. Nicoloff, Psy. D., Dr. Nicoloff assessed plaintiff for the period May 8, 2008, to September 15, 2008. Exh. 3 to Meneghello Declr.[3] The form has a section labeled "Categories," under which "12.02" appears. Id. "12.02" is contained in a body of regulations pertaining to SSD applications, and refers to 20 C.F.R., Part 404, Subpart P, Appendix 1, section 12.02 which governs organic mental disorders. In the MRFC, Dr. Nicoloff assessed plaintiff as markedly limited in (1) the ability to understand and remember detailed instructions, (2) the ability to carry out detailed instructions, (3) the ability to perform activities within a schedule, maintain regular attendance, and be punctual within

---

[2] Plaintiff challenges the admissibility of this document. This, and other evidentiary objections, are discussed below.

[3] Plaintiff challenges the admissibility of this document. As with the other challenged documents, I discuss this below.

customary tolerances, and (4) the ability to sustain an ordinary routine without special supervision. *Id.* Plaintiff was rated moderately limited in a number of other categories. Additionally, Dr. Nicoloff stated that while plaintiff was able to understand short and simple instructions, she was unable to understand and remember detailed or multi-step instructions. *Id.* She was unable to carry out detailed instructions or to maintain a work schedule without special supervision. *Id.* She should have limited direct contact with the public. *Id.* She also needs supervision and direction throughout the workday/workweek and is unable to complete a normal workday/workweek with normal supervision even if the tasks are simple. *Id.*

Plaintiff started receiving "social security income" when she was in a "life skills program" at age 19, a program she entered in the fall of 2003. Exh. 4 to Crispin Declr. (Bridget Davis Depo.) at pp. 46-47. She continued to receive income from social security, but the benefit was decreased when she worked at Fred Meyer and for defendant due to her job earnings. *Id.* at p. 47. Bridget explained that

> Brianne's disability has not changed. And from the time that we applied for her in 2004, the SSI was made available to her, and then we had to reapply again on her behalf after her employment ended at Wal-Mart in May of 2008. And we had to go through the process of providing all of her documentation for Social Security.

*Id.* at pp. 47-48.

In the two and one-half years since her termination, plaintiff has not worked and is not looking for paying work. Exh. 4 to Meneghello Declr. (Pltf Depo.) at pp. 58, 63-65. She does not think she is able to hold a paying job. *Id.* at p. 64.

15 - FINDINGS & RECOMMENDATION

STANDARDS

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

"If the moving party meets its initial burden of showing 'the absence of a material and triable issue of fact,' 'the burden then moves to the opposing party, who must present significant probative evidence tending to support its claim or defense.'"  Intel Corp. v. Hartford Accident & Indem. Co., 952 F.2d 1551, 1558 (9th Cir. 1991) (quoting Richards v. Neilsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987)).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material.  T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  All reasonable doubts as to the existence of a genuine issue of fact must be resolved against the moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).  The court should view inferences drawn from the facts in the light most favorable to the nonmoving party.  T.W. Elec. Serv., 809 F.2d at 630-31.

If the factual context makes the nonmoving party's claim as to

16 - FINDINGS & RECOMMENDATION

1  the existence of a material issue of fact implausible, that party

2  must come forward with more persuasive evidence to support his

3  claim than would otherwise be necessary.  Id.; In re Agricultural

4  Research and Tech. Group, 916 F.2d 528, 534 (9th Cir. 1990);

5  California Architectural Bldg. Prod., Inc. v. Franciscan Ceramics,

6  Inc., 818 F.2d 1466, 1468 (9th Cir. 1987).

7                              DISCUSSION

8      Plaintiffs bring the following claims:  (1) an Americans with

9  Disabilities Act (ADA) claim for failure to accommodate and engage

10  in the interactive process; (2) an analogous claim under Oregon

11  Revised Statute § (O.R.S.) 659A.118 for failure to accommodate and

12  engage in interactive process; (3) an ADA claim for terminating

13  plaintiff because of her disability; (4) an analogous claim under

14  O.R.S. 659A.112 for terminating plaintiff because of her

15  disability; and (5) a claim under O.R.S. 652.150 for penalty wages

16  for wages not paid at termination.

17  I.  ADA and O.R.S. 659A.103-659A.145 Generally

18      The ADA, 42 U.S.C. §§ 12101-12213, provides that "[n]o covered

19  entity shall discriminate against a qualified individual with a

20  disability because of the disability . . . ."  42 U.S.C. §

21  12112(a).  The ADA defines a "qualified individual with a

22  disability," as "an individual with a disability who, with or

23  without reasonable accommodation, can perform the essential

24  functions of the employment position that such individual holds or

25  desires."  42 U.S.C. § 12111(8).

26      Similarly, under Oregon law, it is an "unlawful employment

27  practice for any employer to refuse to hire, employ or promote, to

28  bar or discharge from employment or to discriminate in compensation

17 - FINDINGS & RECOMMENDATION

1  or in terms, conditions or privileges of employment on the basis of

2  disability." O.R.S. 659A.112(1).

3      For the purposes of O.R.S. 659A.112, an "individual is

4  qualified for a position if the individual, with or without

5  accommodation, can perform the essential functions of the

6  position." O.R.S. 659A.115.

7      Oregon's disability law is to be construed to the extent

8  possible in a manner consistent with similar provisions of the ADA.

9  O.R.S. 659A.139.  Thus, the same analysis applies to plaintiffs'

10  ADA and Oregon statutory disability claims.  E.g., Haddock v.

11  Lucent Techs., Inc., No. CV-07-801-HU, 2008 WL 4133573, at *5 (D.

12  Or. Aug. 29, 2008) (plaintiff's claims under ADA and Oregon

13  disability law are analyzed the same); Spicer v. Cascade Health

14  Servs., Inc., No. CV-03-6377-TC, 2005 WL 2211097, at *5 (D. Or.

15  Sept. 9, 2005) ("Oregon laws on disability discrimination are to be

16  construed in a manner consistent with the federal ADA.").

17      Plaintiff brings both straightforward disability

18  discrimination claims based on an alleged unlawful termination, and

19  reasonable accommodation claims.  Both the ADA and Oregon law

20  include the failure to reasonably accommodate a disability as a

21  form of discrimination.  Under the ADA, the term "discriminate"

22  includes

23      not making reasonable accommodations to the known
        physical or mental limitations of an otherwise qualified
24      individual with a disability who is an applicant or
        employee, unless such covered entity can demonstrate that
25      the accommodation would impose an undue hardship on the
        operation of the business of such covered entity.
26
27  42 U.S.C. § 12112(b)(5)(A).  Under Oregon law, the employer commits

28  an unlawful employment practice if the employer fails to make

18 - FINDINGS & RECOMMENDATION

1   "reasonable accommodation to the known physical or mental
2   limitations of a qualified individual with a disability who is a
3   job applicant or employee" unless the employer shows that the
4   accommodation would create an undue hardship on the employer's
5   business operations.  O.R.S. 659A.112(2)(e).
6   II.  Qualified Individual
7       To succeed on either of her disability claims, plaintiff must
8   establish that she is a qualified individual with a disability.
9   Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1108 (9th
10  Cir. 2000) ("An ADA plaintiff bears the burden of proving that she
11  is a qualified individual with a disability.") (internal quotation
12  omitted); see also Allen v. Pacific Bell, 348 F.3d 1113, 1114 (9th
13  Cir. 2003) (to prevail on a reasonable accommodation claim,
14  plaintiff must show he or she is a qualified individual who can
15  perform essential functions of the job with reasonable
16  accommodation).  Defendant contends that plaintiff is not a
17  qualified individual as defined by the statutes.
18      A.  Representations to Social Security
19      Defendant argues that plaintiff cannot succeed on her
20  disability claims because plaintiff is not "qualified" as a result
21  of her representations to the SSA.
22      In Cleveland v. Policy Management System Corporation, the
23  Supreme Court considered whether "an ADA plaintiff's representation
24  to the SSA that she was totally disabled created a rebuttable
25  presumption sufficient to judicially estop her later representation
26  that, for the time in question, with reasonable accommodation, she
27  could perform the essential functions of her job."  526 U.S. 795,
28  802 (1999) (internal quotation and brackets omitted).  The Court's

19 - FINDINGS & RECOMMENDATION

1  short answer was "no," meaning that no rebuttable presumption was
2  created.

3      The Court explained that "despite the appearance of conflict
4  that arises from the language of the two statutes, the two claims
5  do not inherently conflict to the point where courts should apply
6  a special negative presumption like the one applied . . . here . .
7  . because there are too many situations in which a [SSD] claim and
8  an ADA claim can comfortably exist side by side." Id. at 802-03.

9      Notably, the Court stated, under the ADA, a "qualified
10 individual" includes one who can perform the essential functions of
11 the job with reasonable accommodation, where, in contrast, the SSA
12 determines disability without taking into account the possibility
13 of reasonable accommodation.    Id. at 803.    Thus, "an ADA suit
14 claiming that the plaintiff can perform her job with reasonable
15 accommodation may well prove consistent with [a SSD] claim that the
16 plaintiff could not perform her own job (or other jobs) without
17 it."  Id.

18     Nonetheless, the Court recognized that in some cases, an
19 earlier SSD claim could "genuinely conflict" with an ADA claim.
20 Noting that a plaintiff's sworn assertion in an application for
21 disability benefits that she is, "for example, 'unable to work,'
22 will appear to negate an essential element of her ADA claim," the
23 Court held that an ADA plaintiff cannot "ignore the apparent
24 contradiction that arises out of the earlier . . . total disability
25 claim."   Id. at 806.    Rather, the plaintiff must offer a
26 "sufficient explanation." Id.  Thus,

27         [w]hen faced with a plaintiff's previous sworn statement
           asserting "total disability" or the like, the court
28         should  require  an  explanation  of  any  apparent

20 - FINDINGS & RECOMMENDATION

1    inconsistency with the necessary elements of an ADA
2    claim. To defeat summary judgment, that explanation must
     be sufficient to warrant a reasonable juror's concluding
3    that, assuming the truth of, or the plaintiff's good-
     faith belief in, the earlier statement, the plaintiff
4    could nonetheless 'perform the essential functions' of
     her job, with or without 'reasonable accommodation.'"

5    Id. at 807.

6        Here, defendant notes that the SSA concluded that the date

7    plaintiff became too disabled to work was May 8, 2008, Exh. 17 to

8    Meneghello Declr. at p. 1 (SSA Notice of Award), and that the SSA

9    concluded that plaintiff was incapable of performing any past work,

10   or any work at all, since her termination.  Exh. 2 to Meneghello

11   Declr. at p. 1 ("Vocational Decision Worksheet").  And, the SSA

12   concluded that plaintiff is unable to work in the national economy,

13   specifically concluding that plaintiff is unable to complete a

14   normal workday with normal supervision even if the tasks are

15   simple.  Exh. 3 to Meneghello Declr. at p. 3 (MRFC).

16       Defendant argues that it is impossible for plaintiff to

17   explain away the inconsistency of the SSA's conclusions and the

18   basis for her ADA claim.  Defendant argues that "[t]he information

19   plaintiff provided to reach these conclusions, and the fact that

20   she has accepted them and has received direct benefit from them,

21   should lead this Court to deny her the ability to now contradict

22   them in another forum as she attempts to benefit from another legal

23   process."  Deft's Mem. at p. 10.

24       Plaintiff argues that because defendant has not presented

25   admissible evidence of any sworn statement by plaintiff that she

26   was totally disabled as of any relevant date, which plaintiff

27   maintains is required by Cleveland, defendant's argument fails.

28   Plaintiff notes that the "Psychological Evaluation," "Vocational

21 - FINDINGS & RECOMMENDATION

1  Decision Worksheet," and "Mental Residual Functional Capacity
2  Assessment," documents relied on by defendant, are "inadmissible
3  hearsay" and should be stricken, and furthermore, that these
4  exhibits fail to include any factual representations by plaintiff
5  that are inconsistent with her claims in this case. And, as to the
6  SSA's Notice of Award and an unsigned Disability Report, found in
7  Exhibit 17 to Meneghello's Declaration, plaintiff states neither of
8  these documents contain any "sworn assertion in an application for
9  disability benefits," triggering a responsive explanation by
10 plaintiff.

11     I agree with plaintiff that the "Vocational Decision
12 Worksheet" and the "Mental Residual Functional Capacity Assessment"
13 which contain the SSA's conclusions that (1) plaintiff has been
14 incapable of performing any past work, or any work at all, since
15 her termination, and (2) plaintiff is unable to work in the
16 national economy, specifically that she is unable to complete a
17 normal workday with normal supervision even if the tasks are
18 simple, do not contain an assertion by plaintiff that gives rise to
19 the issue outlined by Cleveland. Putting aside whether the
20 statements are sworn, Cleveland and subsequent cases do not concern
21 the issue of whether a conclusion by the SSA contradicts a
22 plaintiff's ADA claim. Rather, the cases address the issue of
23 contradictory statements by an ADA plaintiff who previously sought
24 disability and represented in the application for disability that
25 the plaintiff is totally disabled. The SSA's conclusion that
26 plaintiff was totally disabled is not the same as a statement by
27 plaintiff that she is. Thus, I do not consider, for this argument,
28 the admissibility of the Vocational Decision Worksheet and the MRFC

22 - FINDINGS & RECOMMENDATION

because neither of these contain any actual representations made by plaintiff regarding her disability. Additionally, the "Psychological Evaluation" is similarly devoid of statements by plaintiff regarding her disability.

I still must consider the "Disability Report - Adult - Form SSA-3368." Exh. 17 to Meneghello Declr. at pp. 2-10. Plaintiff states that as presented, this is an unsigned disability report and for that reason alone does not trigger any response by plaintiff required by Cleveland because there is no sworn statement. Defendant submits nine pages of the form. Meneghello states, in his declaration, that this is plaintiff's application, which was introduced and authenticated as Exhibit 16 of Bridget's deposition. Meneghello Declr. at ¶ 18. None of the submitted pages of the form indicates that the statements were made under oath. Plaintiff does not challenge the admissibility or authenticity of this particular exhibit. Rather, her argument is that this is not her sworn statement. Defendant replies that nothing in Cleveland or its progeny suggests that a plaintiff must use any magic words to put the issue in play.

I need not resolve the dispute regarding whether a statement triggering the "explanation" obligation in Cleveland must actually be sworn because even if it is triggered in this case, plaintiff provides a satisfactory explanation for any apparently contradictory statements.

In the Disability Report, plaintiff's assertion that she became unable to work because of her illness, injuries, or conditions on October 1, 2003, likely triggers her obligation to provide an explanation for what appears to be a contradictory ADA

23 - FINDINGS & RECOMMENDATION

claim.    Thus, plaintiff must provide an explanation for the apparent inconsistency with her ADA claim "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of her job, with or without 'reasonable accommodation.'"  Cleveland, 526 U.S. at 807.

Plaintiff argues that she can indeed perform her job with reasonable accommodation and thus, her statement that she has been disabled from working since October 1, 2003, is sufficiently explained because for purposes of that statement, made in the context of the SSD application, the concept of reasonable accommodation is not considered.  Thus, she contends, that while she may be disabled for purposes of SSD, this is not inconsistent with her position that she can work with reasonable accommodation. I agree with plaintiff.

Here, defendant is not entitled to summary judgment on the "qualified individual" issue under Cleveland because first, the evidence it cites other than the Disability Report does not contain statements made by plaintiff, and second, considering the statements she made in the Disability Report, which trigger the required explanation, plaintiff provides one.

B.  Facts re: Qualified Individual

Defendant alternatively argues that even if plaintiff can raise a genuine issue of fact regarding her explanation of her social security application, the facts and circumstances surrounding her physical condition demonstrate that she is not a qualified individual under the ADA.  Defendant cites to six facts:

24 - FINDINGS & RECOMMENDATION

(1)   plaintiff has not been employed at all since she was terminated in May 2008, a period of over twenty-nine months;

(2) plaintiff has not been looking for work since she was terminated and although a vocational counselor applied for at least one job on plaintiff's behalf since termination, Bridget testified at deposition that "Brianne hasn't been ready to look for another position"; Bridget Depo. at pp. 44-45;

(3) plaintiff's current activities include spending her day sleeping, playing video games, or watching television; Pltf Depo. at pp. 58-59;

(4) plaintiff herself testified at deposition that she did not think she was capable of holding a paying job at present; Id. at p. 64;

(5) Dr. Nicoloff's conclusion that plaintiff is unable to complete a normal workday/workweek with normal supervision even if the tasks are simple; Exh. 3 to Meneghello Declr;[4] and

(6) the response of "no" that plaintiff gave in her Disability Report to the question of "[d]id you work at any time after the date your . . . condition first interfered with your ability to work?"  Exh. 17 to Meneghello Declr.

Defendant argues that there is no material question as to whether plaintiff is "qualified," because her own representations, the conclusions by SSA, and her inability to secure, or even look for, work in more than two and one-half years, confirm that she is not a "qualified individual" under the ADA.  Defendant cites to one

_____

[4]   As indicated above, plaintiff challenges the admissibility of this document.  I discuss that issue below.

25 - FINDINGS & RECOMMENDATION

1  unpublished Sixth Circuit case, and an Eighth Circuit case for the

2  proposition that evidence of a plaintiff's condition post-

3  termination is relevant to the determination of whether the

4  plaintiff is a qualified individual under the ADA. Both cases are

5  distinguishable.

6      In the Sixth Circuit case, the court concluded that the

7  plaintiff failed to create an issue of fact regarding being a

8  "qualified individual," when, although she performed her sheriff's

9  deputy position with a lung condition, she subsequently had part of

10  a lung removed, her post-termination pulmonary function tests

11  indicated she would not be able to perform the essential functions

12  of the job, and the employer was not required to shift essential

13  functions to other employees in an attempt to reasonably

14  accommodate her. Hummel v. County of Saginaw, No. 00-2468, 40 Fed.

15  Appx. 965 (6th Cir. 2002) (unpublished).

16     Hummel is distinguishable because there, the evidence showed

17  that the plaintiff's medical condition had deteriorated

18  significantly since she last performed her job as a consequence of

19  her lung surgery and resulting lung function deterioration. Here,

20  the facts that plaintiff may not be interested in looking for work

21  and is doing nothing with her time, do not address the question of

22  whether she is a qualified individual. None of this evidence

23  addresses whether she could perform her job with reasonable

24  accommodation. That is, while the evidence is capable of

25  suggesting plaintiff cannot perform the essential functions of the

26  job, there is nothing in this record, in contrast to the facts in

27  Hummel, showing an actual change in plaintiff's underlying medical

28  condition and thus, the issue remains whether she can perform the

26 - FINDINGS & RECOMMENDATION

1  essential functions of the job with reasonable accommodation.  The
2  evidence cited by defendant does not address that issue.

3      In the Eighth Circuit case, the plaintiff worked as a
4  corrections officer, suffered a head injury in a collision which
5  caused organic brain syndrome and organic personality disorder, and
6  then experienced a number of symptoms as a result.  Land v.
7  Washington County, Minn., 243 F.3d 1093 (8th Cir. 2001).
8  Subsequently, the plaintiff requested reasonable accommodation in
9  the form of written assistance and extra training, and advance
10 notice of pesticide painting or spraying.  Id. at 1094.  His
11 request was granted.  Id.  At times, he also functioned as an
12 unpaid field training officer in addition to his correctional
13 officer position.  But, after the jail moved, in 1993, to a new and
14 larger facility with sixty employees instead of nine, he was not
15 asked to assume field training for officer duties in the new
16 facility.  Id.  He also was passed over for promotion to sergeant
17 twice.

18     The plaintiff filed an employment discrimination action in
19 1997.  The district court dismissed the ADA claim, finding that the
20 plaintiff had not shown that the County's asserted reasons for its
21 action were a pretext for discrimination on the basis of
22 disability.  Id.

23     The appellate court considered whether the plaintiff had shown
24 a prima face case as to the promotion claim, including the element
25 of whether the plaintiff had shown that he was qualified for the
26 position within the meaning of the ADA.  Id. at 1096.  The court
27 explained that the plaintiff had to show that with or without
28 reasonable accommodation, his work performance met the employer's

27 - FINDINGS & RECOMMENDATION

legitimate job expectations. Id. The court stated that an "ADA plaintiff may not rely on past performance to establish that he is a qualified individual without accommodation when there is undisputed evidence of diminished or deteriorated abilities." Id.

The employer conceded that until 1998, the plaintiff was qualified for, and performed, the position of corrections officer. But, the court explained, there was no evidence that the plaintiff could have performed as a sergeant or a field training officer in the larger jail. Id. By his own admission, the plaintiff had memory problems, problems understanding new equipment, and was prone to emotional outbursts. Id. The record showed that he placed 12th out of 15th for the first sergeant exam, and placed 8th out of 10th on a second sergeant exam. Id.

Additionally, the evidence the plaintiff presented on reasonable accommodation failed to show that the reasonable accommodation requested would have enabled the plaintiff to perform the essential functions of the job. Id. The plaintiff testified that after September 1998, he could no longer work at all and had applied for disability benefits. Id. He admitted that he was unable to perform the job, with or without accommodation, after September 1998. Id.

In the instant case there is no evidence of diminished or deteriorated abilities of plaintiff's, or that the job has materially changed. The evidence does not show that her impairments have worsened, only that she is not working, not looking for work, thinks she is incapable of holding a paying job (without addressing the issue of reasonable accommodation), and that with normal supervision, she would have a hard time completing

1  simple tasks in a normal workday.  In contrast to Land, there is an
2  issue as to whether plaintiff is able to perform the job with
3  accommodation.

4      Plaintiff further notes that the evidence relied on by
5  defendant primarily relates to plaintiff's inability to work
6  without reasonable accommodation.  The post-termination evidence
7  fails to address performance of plaintiff's job with reasonable
8  accommodation, fails to show any change in her underlying
9  impairment, and fails to show any change in the job duties.  The
10 cases defendant relies on are distinguishable and the evidence
11 presents an issue of fact regarding plaintiff's ability to perform
12 the job.

13 III.  Reasonable Accommodation & Interactive Process

14     If an employee requests an accommodation, or an employer
15 recognizes that the employee needs an accommodation but may not be
16 able to request it because of a disability, the employer must
17 engage in an interactive process with the employee to determine the
18 appropriate reasonable accommodation.  Zivkovic v. Southern Cal.
19 Edison Co., 302 F.3d 1080, 1089 (9th Cir. 2002).  The employee need
20 not use any particular language when requesting an accommodation,
21 but need only "inform the employer of the need for an adjustment
22 due to a medical condition." Id. (internal quotation omitted).

23     The employer should initiate the reasonable accommodation
24 process without being asked if the employer:  "(1) knows that the
25 employee has a disability, (2) knows, or has reason to know, that
26 the employee is experiencing workplace problems because of the
27 disability, and (3) knows, or has reason to know, that the
28 disability prevents the employee from requesting a reasonable

29 - FINDINGS & RECOMMENDATION

accommodation." Barnett v. U.S. Air, Inc., 228 F.3d 1105, 1112

(9th Cir.2000) (en banc) (internal quotation omitted), vacated on

other grounds, U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 122

(2002).

"The interactive process requires:  (1) direct communication

between the employer and employee to explore in good faith the

possible accommodations; (2) consideration of the employee's

request; and (3) offering an accommodation that is reasonable and

effective." Id.

> Once an employer becomes aware of the need for
> accommodation, that employer has a mandatory obligation
> under the ADA to engage in an interactive process with
> the employee to identify and implement appropriate
> reasonable accommodations. Barnett v. U.S. Air, 228 F.3d
> 1105, 1114 (9th Cir. 2000).  "An appropriate reasonable
> accommodation must be effective, in enabling the employee
> to perform the duties of the position." Id. at 1115.  The
> interactive process requires communication and good-faith
> exploration of possible accommodations between employers
> and individual employees, and neither side can delay or
> obstruct the process.  Id. at 1114-15; Beck v. University
> of Wis. Bd. of Regents, 75 F.3d 1130, 1135 (7th Cir.
> 1996) ("A party that obstructs or delays the interactive
> process is not acting in good faith.  A party that fails
> to communicate, by way of initiation or response, may
> also be acting in bad faith.").  Employers, who fail to
> engage in the interactive process in good faith, face
> liability for the remedies imposed by the statute if a
> reasonable accommodation would have been possible.
> Barnett, 228 F.3d at 1116.

Humphrey v. Memorial Hospitals Ass'n, 239 F.3d 1128, 1137-38 (9th

Cir. 2001).

Defendant makes four arguments in support of its motion

directed to the reasonable accommodation claim:  (1) it engaged in

the interactive process and provided reasonable accommodation to

plaintiff; (2) the accommodation of allowing Bridget to become

plaintiff's job coach is not reasonable; (3) the requested

accommodation was not necessary because plaintiff demonstrated the

30 - FINDINGS & RECOMMENDATION

1  ability to know and understand her job; and (4) the requested
2  accommodation is not reasonable, nor designed to be effective,
3  because it would interfere with defendant's ability to uniformly
4  apply its misconduct rules.

5      A.  Providing Accommodation

6      Defendant argues that it did all it was required to do under
7  the law because both Kime and Roeder interacted with plaintiff
8  regarding her needs and duties, and provided plaintiff with several
9  reasonable accommodations.  Defendant allowed a job coach to
10 accompany plaintiff to her job interview and be present with her
11 during several of her initial shifts to ensure she received full
12 and complete training on the job.  Then, after Kime initially noted
13 that plaintiff's job performance was suffering, she did not
14 immediately discipline plaintiff, but instead, requested that
15 plaintiff's job coach come to the store to discuss plaintiff's
16 performance.  Defendant also cites to Kime's testimony that when
17 she issued plaintiff the Verbal Coaching in April 2007, Kime met
18 with plaintiff, discussed the issues that occurred, and "what we
19 need to do to help the situation," including asking if there was
20 anything defendant could do to help her improve.  Kime Depo. at p.
21 22.

22     Beginning in August 2007, Roeder also worked with plaintiff
23 regarding performance problems rather than immediately disciplining
24 her.  Then, at some point, likely after the October and November
25 2007 Written Coaching and Decision-Day disciplines issued by
26 Roeder, Roeder transferred plaintiff to a less complex job
27 assignment at the fitting room.

28     Defendant notes that the Equal Employment Opportunity

31 - FINDINGS & RECOMMENDATION

Commission (EEOC) Enforcement Guide states that a temporary job coach to assist in the training of a disabled individual is a valid accommodation, as is reassignment.   EEOC Enforcement Guidance on the ADA and Psychiatric Disabilities, No. 915.002 (3/25/97), at p. 27; 42 U.S.C. § 12111(9)(B) (regarding reassignment).

Defendant argues that it has gone above and beyond what is expected of an employer and that the fact that plaintiff received reasonable accommodations cannot be questioned.   And, because, defendant argues, it is not obligated to provide the specific accommodation requested by Bridget, its failure to provide that accommodation does not mean that defendant did not reasonably accommodate plaintiff.   See 29 C.F.R. pt. 1630 app. § 1630.9 (employer's prerogative to provide accommodation of its choosing, as long as that accommodation choice is designed to be effective).

B.   Appointing Bridget as Job Coach

Defendant contends that Bridget's request to be appointed as plaintiff's job coach is not a reasonable accommodation.   Under the EEOC guidelines, a job coach is a "professional who assists individuals with severe disabilities with job placement and job training." EEOC Enforcement Guide, No. 915.002 (3/25/97) fn. 63. Bridget testified in deposition that she is not a professional in this area, having never undertaken any training, and is not classified as a job coach by a government agency or any other organization.   Bridget Depo. at pp. 21-22.   And, under the EEOC guidelines, a job coach is noted to be a "temporary" aid to "assist in the training of a qualified individual with a disability."   EEOC Enforcement Guide, No. 915.002 (3/25/970, question no. 27 (emphasis added).

32 - FINDINGS & RECOMMENDATION

C.  Accommodation Unnecessary

Defendant argues that the reasonable accommodation claim should fail because plaintiff's own testimony shows that she did not need the very accommodation she now claims was needed. Defendant argues that although she now contends that she needed a job coach to understand her job, she worked for defendant displaying an understanding of defendant's expectations and rules.

In deposition, plaintiff testified that she knew it was an important part of her job to locate and retrieve merchandise, to provide customer assistance regarding price availability and features of the menswear department, to accurately and efficiently stock merchandise in the menswear department, and to zone and clean her department.  Pltf Depo. at pp. 31-32.  She also described the tasks included in "zoning," as picking things up off the floor, folding clothes, straightening shelves, and straightening racks. Id. at p. 32.  She understood that it was an important part of her job to properly place the merchandise on the racks and the side counters.  Id.

Additionally, she testified that she knew not to take too long on her lunch or breaks, that she did not need to clock out for regular breaks, but only for lunch, and that she knew she needed to clock in and out for meal periods.  Pltf Depo. at pp. 25-26.  She also knew that if she returned late, she would get a "meal exception," although she did not remember exactly what that was. Id. at p. 26.

Defendant argues that the testimony shows that plaintiff demonstrated the ability to know and understand her job and thus, she cannot reasonably argue that a job coach was a reasonable

33 - FINDINGS & RECOMMENDATION

accommodation.  Furthermore, she was disciplined for conduct that a job coach could not help her with.  The Verbal Coaching was for, at least in part, displaying a poor attitude and making inappropriate comments under her breath.  The Decision-Making Day Coaching was for, in part, having a negative attitude when approached by other Associates and Management.  Defendant contends that it is unreasonable to claim that plaintiff would have been able to avoid this kind of behavior with the presence of a job coach at some additional times of her employment.

D.  Uniform Application of Misconduct Rules

Finally, defendant argues that the reasonable accommodation claim must fail because reasonable accommodation does not include rescinding discipline.  According to defendant, an employer may uniformly impose discipline for misconduct and performance problems because employers may hold all employees, meaning those with or without disabilities, to the same performance and conduct standards.  See Jones v. American Postal Workers Union, 192 F.3d 417, 429 (4th Cir. 1999) ("The law is well settled that the ADA is not violated when an employer discharges an individual based upon the employee's misconduct, even if the misconduct is related to a disability.").[5]

Defendant argues that in essence, plaintiff seeks an order from this Court requiring the employer to hold her to a different

---

[5]  This does not appear to be the law of the Ninth Circuit. See Humphrey, 239 F.3d at 1139-40 ("For purposes of the ADA, with a few exceptions [for alcoholism or drug abuse] conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination") (footnote omitted).  However, as discussed below, even accepting this proposition of law as valid, I reject defendant's argument.

34 - FINDINGS & RECOMMENDATION

1  standard of performance and conduct than is required of its other

2  employees.  And, her requested accommodation of allowing Bridget to

3  be present at disciplinary meetings and to be contacted when

4  problems arise, is not designed to be an effective solution to the

5  attitude, performance, and misconduct problems.

6      E.  Discussion

7      The record shows that there are questions of fact as to

8  whether defendant participated in a good faith interactive process

9  required to identify reasonable accommodations to plaintiff.  On

10  the one hand, defendant offered several "accommodations" regarding

11  plaintiff's work performance issues, including having her start

12  with a job coach, subsequently calling the job coach, working with

13  her to remind her of tasks she needed to complete, and transferring

14  her to a less complex job.  On the other hand, defendant should

15  have been aware of her need for accommodation from the initial

16  presence of the job coach and the obvious nature of her disability.

17  The explicit accommodation inquiry from Bridget was further notice.

18  See Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 313 (3d Cir.

19  1999) (request from employee's family member or psychiatrist can

20  trigger employer's obligation to engage in interactive process).

21  Nonetheless, despite this, defendant never provided plaintiff, or

22  Bridget, with defendant's own "ADA packet," which defendant uses to

23  begin the interactive process.

24      As explained in Barnett, "employers, who fail to engage in the

25  interactive process in good faith, face liability for the remedies

26  imposed by the statute if a reasonable accommodation would have

27  been possible.  We further hold that an employer cannot prevail at

28  the summary judgment stage if there is a genuine dispute as to

whether the employer engaged in good faith in the interactive process." 228 F.3d at 1116.

Because, plaintiff argues, defendant failed to engage in the interactive process, it failed to explore what was required to permit plaintiff to comply with the meal and break rules, including (1) allowing Bridget to work with plaintiff to understand the requirements of the policy, (2) giving plaintiff more effective training in the requirements of the policy, (3) designating a particular time for her to take her breaks, or (4) giving her reminders.

Barnett also makes clear, however, that employers who fail to engage in the interactive process face liability only "if a reasonable accommodation would have been possible." Id. It is plaintiff's burden to establish that a reasonable accommodation is possible. Dark v. Curry County, 451 F.3d 1078, 1088 (9th Cir. 2006) (plaintiff "has the burden of showing the existence of a reasonable accommodation that would have enabled him to perform the essential functions of an available job."). However, to avoid summary judgment, a plaintiff "need only show that an 'accommodation' seems reasonable on its face, i.e., ordinarily or in the run of cases." Id. (internal quotation omitted).

The question here becomes whether a reasonable accommodation would have been possible. If not, the failure to engage in the interactive process does not create liability for defendant.

Plaintiff suffered from two distinct performance issues: (1) her general performance in completing her tasks and her attitude; and (2) her problems complying with the meal and break policy. The progression of her discipline reflects problems with both issues

36 - FINDINGS & RECOMMENDATION

given that the April 2007 Verbal Coaching concerned her performance, negative attitude, and making rude comments under her breath, the October 2007 Written Coaching concerned failing to clock out for meals, the November 2007 Decision-Making Day addressed being unproductive with tasks and a negative attitude, and the subsequent termination was based on a meal violation.

Plaintiff may or may not have understood the meal and break policy. See Pltf Depo. at pp. 25-26 (testifying that she knew not to take too long on her lunch or breaks, that she did not need to clock out for regular breaks, but only for lunch, and that she knew she needed to clock in and out for meal periods, but also stating that while she knew that if she returned late, she would get a "meal exception," she did not remember exactly what that was, and did not know that she would get in trouble for meal exceptions); Pltf Depo. at p. 55 (stating that she believed she understood how to correctly clock in and out for breaks and meal breaks and did not need anyone's help in doing that correctly).

I agree with defendant that appointing Bridget as a job coach and expecting defendant to allow Bridget to accompany plaintiff to work on a permanent basis, or even to call her every time there was a problem, is likely unreasonable. Plaintiff cites to no provision of the ADA requiring the employer to allow a family member as a permanent "job coach" to ensure an employee's ability to perform the essential functions of the position.

However, the other identified possible accommodations are not inherently unreasonable, and defendant appears to be working with at least one other employee regarding his meals or breaks. See Exh. 3 to Crispin Declr. (Roeder Depo.) at pp. 13-14 (under seal)

37 - FINDINGS & RECOMMENDATION

(Roeder testified that she supervises an Associate with Alzheimer's and she makes sure "he gets clocked in and has been assisted to being able to get to his lunches on time."); see also Exh. 3 to Crispin Declr. (Roeder Depo.) at p. 14; Exh. 3A to Crispin Declr. (Roeder Depo.) at p. 19 (under seal) (Roeder testified she has an Associate in maintenance who is not directly under her, but she assists with follow-up when he has questions or with his behavior, and when he "needs to get rerouted back into doing the job and not sidetracked"; noting that when he gets "busy speaking," talking with other Associates, "they" have to get him back on track and may need to remind him to complete his job).

As to the meal and break policy, defendant is not entitled to summary judgment because there is an issue of fact regarding defendant's failure to participate in the interactive process and because plaintiff has identified at least some possible accommodations that appear reasonable on their face.

As to plaintiff's performance of her duties, the evidence in the record is mixed. The discipline taken against her for her poor performance and the testimony by Kime and Roeder regarding her poor performance show that she struggled with requirements of her position, and, additionally, had some issues with her attitude. On the other hand, she had a performance evaluation in early October 2007, signed by Roeder, in which Roeder assessed her overall as meeting expectations. And, Roeder stated there that plaintiff was good at following instructions.

The evidence creates an issue of fact as to whether plaintiff could perform the essential performance functions of her job with or without reasonable accommodation. Barnett states that an

38 - FINDINGS & RECOMMENDATION

1   employer who fails to engage in the interactive process will be
2   liable if the jury can reasonably conclude that the employee would
3   have been able to perform the job with accommodations, and
4   importantly, "[i]n making that determination, the jury is entitled
5   to bear in mind that had the employer participated in good faith,
6   there may have been other, unmentioned possible accommodations."
7   Barnett, 228 F.3d at 1116 (internal quotation omitted).

8       Here, while the specific accommodations plaintiff identifies
9   are tailored to the meal and break policy issues, there are likely
10  a range of reasonable accommodations that could assist plaintiff in
11  performing her job duties that would easily be identified if
12  defendant complied with its own policy regarding the interactive
13  process.

14      As to defendant's argument that accommodation is unnecessary
15  because plaintiff demonstrated an understanding of her job duties,
16  an understanding of the duties and the ability to properly execute
17  them are two different things.  Moreover, as noted above, there are
18  issues concerning how well plaintiff understood and remembered
19  aspects of her job.

20      Finally, defendant's argument that it cannot be forced to
21  ignore its uniformly-imposed conduct rules, is unavailing.  The
22  evidence is capable of suggesting that if plaintiff had received
23  reasonable accommodation, she may not have had problems violating
24  "uniformly-imposed conduct rules."  This is not a case where the
25  employee's misconduct, even if it is attributable to a disability,
26  cannot be eased by a reasonable accommodation.  Thus, for example,
27  in a case where the employee's Tourette's Syndrome caused him to
28  blurt out profanities, the employer did not violate the ADA when it

39 - FINDINGS & RECOMMENDATION

discharged him and when the employee's proposed accommodation
asking the employer to "understand" his condition, was
unreasonable. Ray v. Kroger Co., 264 F. Supp. 2d 1221, 1228 (S.D.
Ga. 2003), aff'd 90 Fed. Appx. 384 (11th Cir. 2003). Here, as long
as plaintiff has proposed accommodations which are reasonable, this
line of cases does not help defendant.

In summary, on the reasonable accommodation claims, while the
record shows that defendant has in fact offered some accommodation
to plaintiff, there is evidence suggesting that it failed to engage
in an interactive process to identify reasonable accommodations.
I recommend that summary judgment be denied on plaintiff's
reasonable accommodation claims.

IV.  Discrimination - Termination

The familiar burden-shifting framework of McDonnell Douglas is
used for disability discrimination cases in the Ninth Circuit.
E.g., Snead v. Metropolitan Prop. & Cas. Co., 237 F.3d 1080, 1093
(9th Cir. 2001). This is also the case for Oregon disability
discrimination claims adjudicated in federal court. Id. at 1090-
93 (McDonnell Douglas burden shifting, and not Oregon's "prima-
facie only" rule, applies to Oregon Chapter 659A claims in federal
court in diversity cases); Dawson v. Entek Int'l, No. 09-35844,
2011 WL 61645, at *4 (9th Cir. Jan. 10, 2011) ("Snead represents
the law of this circuit and applies in all cases in federal
district court in which the choice between federal and state
procedural law is presented. The answer to the question whether
federal procedural law must be applied is the same regardless of
the source of the federal court's subject matter jurisdiction over
a claim.").

40 - FINDINGS & RECOMMENDATION

1    Under this framework, plaintiff must first establish a prima

2  facie case of discrimination. Chuang v. University of Cal., 225

3  F.3d 1115, 1123 (9th Cir. 2000). Once she does so, the burden of

4  production shifts to defendant to articulate a legitimate,

5  nondiscriminatory reason for its action. Id. If it does so, then

6  plaintiff must show that defendant's proferred reason is

7  pretextual. Id. at 1124.

8    To establish a prima facie case, plaintiff must show that she

9  is disabled, is a qualified individual under the ADA, and that

10  defendant terminated her because of her disability. Allen v.

11  Pacific Bell, 348 F.3d 1113, 1114 (9th Cir. 2003); Nunes v. Wal-

12  Mart Stores, Inc., 164 F.3d 1243, 1246 (9th Cir. 1999). Under the

13  ADA, an adverse employment action is outlawed if it is "motivated,

14  even in part, by animus based on a plaintiff's disability or

15  request for an accommodation-a motivating factor standard." Head

16  v. Glacier Northwest Inc., 413 F.3d 1053, 1065 (9th Cir. 2005).

17    Other than the arguments defendant previously made about

18  plaintiff not being a qualified individual, defendant offers no new

19  argument challenging her prima facie case. Plaintiff has met her

20  prima facie burden.

21    As for a legitimate nondiscriminatory reasons for its actions,

22  defendant states that plaintiff was terminated for violating

23  uniformly applied policy while on her last and final warning.

24  Plaintiff was not the only employee to receive discipline for

25  violating the break and meal policy, and she was not the only

26  employee to be terminated after receiving a Decision-Making Day

27  Coaching. Between January 1, 2006, and July 7, 2008, the Wood

28  Village store issued approximately 347 Verbal, Written, and

41 - FINDINGS & RECOMMENDATION

Decision-Making Day Coachings for violation of the meal and break policy.  Exh. 1 to Pelham Declr.  Between January 1, 2007, and December 31, 2008, approximately 70 employees at the Wood Village store were terminated after violating policy while on a last and final warning.  Exh. 2 to Pelham Declr.

Plaintiff argues that defendant's legitimate nondiscriminatory reason is pretextual.  Plaintiff offers a variety of arguments, but they boil down to two:  (1) because defendant had an obligation to engage in a good faith interactive process with plaintiff regarding the meal and break policy and to reasonably accommodate her regarding this policy, defendant cannot now argue that plaintiff was fired for failing to comply with that policy; and (2) defendant has no evidence that plaintiff actually violated the meal and break policy which resulted in her termination.  Because I agree with plaintiff's first argument, I do not address the second argument.

In Humphrey, the Ninth Circuit noted that "the consequence of the failure to accommodate is . . . frequently an unlawful termination." 239 F.3d at 1139.  The court explained that "[f]or purposes of the ADA, with a few exceptions, . . . conduct resulting from a disability is considered to be part of the disability, rather than a separate basis for termination." Id. at 1139-40 (footnote omitted).  The exceptions noted by the court were for alcoholism or drug abuse, neither of which is at issue in this case.

The court further explained that the "link between the disability and termination is particularly strong where it is the employer's failure to reasonably accommodate a known disability that leads to discharge for performance inadequacies resulting from

42 - FINDINGS & RECOMMENDATION

1   that disability." Id. at 1140.  The court noted that in an earlier

2   case, it had "found that there was a sufficient causal connection

3   between the employee's disability and termination where the

4   employee was discharged for excessive absenteeism caused by

5   migraine-related absences."  Id. (citing Kimbro v. Atlantic

6   Richfield Co., 889 F.2d 869, 875 (9th Cir. 1990)).  And in the case

7   before it, the Humphrey court concluded that the plaintiff had

8   presented sufficient evidence to create a triable issue of fact as

9   to whether her attendance problems were caused by her obsessive

10  compulsive disorder (OCD).  Id.  Thus, a jury could reasonably find

11  the requisite causal link between a disability of OCD and her

12  absenteeism and could conclude that she was fired because of her

13  disability.  Id.

14       In a later case, the Ninth Circuit further explained that the

15  "practical result" of the rule of law articulated in Humphrey meant

16  that "where an employee demonstrates a causal link between the

17  disability-produced conduct and the termination, a jury must be

18  instructed that it may find that the employee was terminated on the

19  impermissible basis of her disability." Gambini v. Total Renal

20  Care, Inc., 486 F.3d 1087, 1093 (9th Cir. 2007).

21       The Ninth Circuit caselaw dictates the result here.  Plaintiff

22  has created a triable issue as to whether her ability to comply

23  with the meal and break policy, and her performance problems in

24  general[6], were caused by her disability.   Thus, a jury could

25

26       [6] Given defendant's progressive discipline policy, I find
    that both the meal and break policy violations and the
27  performance issues have to be considered as the basis for the
    termination because if she had not been given the Verbal Coaching
28  and Decision-Day Coaching about her performance issues, she would

43 - FINDINGS & RECOMMENDATION

reasonably find the requisite causal link between her disability and her performance problems and her meal and break policy compliance issues and thus, a jury could conclude that she was fired because of her disability.

V.   Evidentiary Objections

Plaintiff objects to the Psychological Evaluation (Exhibit 1 to Meneghello Declaration), the Vocational Decision Worksheet (Exhibit 2 to Meneghello Declaration), and to the MRFC (Exhibit 3 to Meneghello Declaration) as inadmissible hearsay.  I need not resolve the hearsay objection because the documents contain no actual statements of plaintiff's and thus, do not raise a conflict for purposes of <u>Cleveland</u>.  Even considering the documents, plaintiff prevails on the qualified individual argument and it is unnecessary to resolve the hearsay objection.

VI.   Wage Claim

As pleaded in the Second Amended Complaint, plaintiff brings a claim for a "wage penalty" under O.R.S. 652.150.  She alleges that at the time of her termination, defendant owed her for time worked on May 13, 2008, plus accrued and unused vacation pay, for a total of $136.24. Sec. Am. Compl. at ¶ 49.  Defendant allegedly willfully failed and refused to pay plaintiff her wages upon termination and for a period in excess of thirty days.  <u>Id.</u> at ¶ 50.  Plaintiff alleges that she is entitled to recover penalty wages pursuant to O.R.S. 652.150 in an amount equal to thirty times her daily wage rate, less penalty amounts previously paid.  <u>Id.</u> at

not have been on a "last and final warning" resulting in her termination for the meal and break policy violation.

44 - FINDINGS & RECOMMENDATION

1    ¶ 51.   She further alleges that she is entitled to recover costs

2    and attorney's fees pursuant to O.R.S. 652.200.

3        O.R.S. 652.150 provides:

4        (1) Except as provided in subsections (2) and (3) of this
         section, if an employer willfully fails to pay any wages
5        or compensation of any employee whose employment ceases,
         as provided in ORS 652.140 and 652.145, then, as a
6        penalty for the nonpayment, the wages or compensation of
         the employee shall continue from the due date thereof at
7        the same hourly rate for eight hours per day until paid
         or until action therefor is commenced. However:

8
         (a)  In  no  case  shall  the  penalty  wages  or
9        compensation  continue  for  more  than  30  days  from
         the  due  date;  and

10
         (b)  A  penalty  may  not  be  assessed  under  this
11       section when an employer pays an employee the wages
         the  employer  estimates  are  due  and  payable  under
12       ORS  652.140  (2)(c)  and  the  estimated  amount  of
         wages  paid  is  less  than  the  actual  amount  of  earned
13       and  unpaid  wages,  as  long  as  the  employer  pays  the
         employee  all  wages  earned  and  unpaid  within  five
14       days  after  the  employee  submits  the  time  records.

15       (2) If the employee or a person on behalf of the employee
         sends a written notice of nonpayment, the penalty may not
16       exceed 100 percent of the employee's unpaid wages or
         compensation unless the employer fails to pay the full
17       amount of the employee's unpaid wages or compensation
         within 12 days after receiving the written notice. If the
18       employee or a person on behalf of the employee fails to
         send the written notice, the penalty may not exceed 100
19       percent of the employee's unpaid wages or compensation.
         For purposes of determining when an employer has paid
20       wages or compensation under this subsection, payment
         occurs on the date the employer delivers the payment to
21       the employee or sends the payment by first class mail,
         express mail or courier service.

22       * * *
23
         (4) Subsections (2) and (3)(b) of this section do not
24       apply when:

25       (a)  The  employer  has  violated  ORS  652.140  or
         652.145 one or more times in the year before the
26       employee's employment ceased; or

27       (b)  The  employer  terminated  one  or  more  other
         employees  on  the  same  date  that  the  employee's
28       employment  ceased.

45 - FINDINGS & RECOMMENDATION

1          *  *  *
2    O.R.S. 652.150.

3          Defendant moves for summary judgment on this claim because it
4    provided plaintiff her alleged wages due, plus one hundred percent
5    of the alleged wages due within twelve days of receiving written
6    notice of nonpayment.  Defendant recites the following facts, which
7    plaintiff does not contest.

8          On February 4, 2009, plaintiff's counsel made an initial
9    allegation that plaintiff did not receive her final paycheck.
10   Counsel for plaintiff failed to provide a specific amount owed, but
11   made a demand that plaintiff be provided her final paycheck
12   "without further delay."  Defense counsel responded to this
13   allegation with a telephone call and two letters requesting a
14   specific dollar amount.  Plaintiff's counsel did not respond to
15   these requests.

16         Although defendant believed it had timely paid plaintiff her
17   final wages, defendant delivered a check for $300 to plaintiff's
18   counsel which constituted the amount of her final wages, plus
19   penalty wages of one hundred percent of that amount, plus an
20   additional amount to cover any small discrepancies.  Defendant
21   provided the check to avoid litigation on this issue.  Defense
22   counsel again asked plaintiff's counsel if the amount was accurate
23   and plaintiff's counsel did not respond.

24         Under O.R.S. 652.150(2), if an employee or person on behalf of
25   an employee sends a written notice of nonpayment, the penalty may
26   not exceed 100 percent of the employee's unpaid wages unless the
27   employer fails to pay the full amount within twelve days of
28   receiving the written notice.

46 - FINDINGS & RECOMMENDATION

1    Defendant argues that under this section, it has done all it

2 is required to do because it paid the amount of allegedly unpaid

3 wages, plus more than 100% of that amount, within twelve days of

4 receiving notice of nonpayment. Defendant further argues that

5 because it provided plaintiff with her final wages plus the penalty

6 wages owed, plaintiff does not have a valid wage claim and thus,

7 she cannot obtain attorney's fees and the claim must be dismissed.

8    Plaintiff argues that under subsection (4) of the statute, the

9 provisions of O.R.S. 652.150(2), which defendant relies on, are not

10 applicable when the employer has violated O.R.S. 652.140 or O.R.S.

11 652.145 one or more times in the year before the employee's

12 employment ended, or, when the employer terminated one or more

13 employees on the same date that the employee's employment ceased.

14 O.R.S. 652.150(4).

15    Plaintiff then concedes that it is normally the plaintiff's

16 burden to show entitlement to the thirty days of penalty wages she

17 seeks in this claim under O.R.S. 652.150(1)(a). But, she argues,

18 defendant has unreasonably refused to provide discovery to confirm

19 its entitlement to the safe haven penalty limited to 100% of the

20 unpaid wages.

21    Plaintiff states that on August 4, 2010, she served Request

22 for Production (RFP) #57 and Interrogatory #18 on defendant

23 requesting information relating to claims alleging violations of

24 the late payment statute within Oregon, and the resolutions

25 thereof. (Plaintiff does not provide copies of these documents).

26 She notes that Interrogatory #19 demanded that defendant list every

27 employee terminated on May 8, 2008, and May 13, 2008, by defendant

28 at any Oregon location. (Plaintiff provides no copy of this

47 - FINDINGS & RECOMMENDATION

1  request).

2  She states that defendant responded to RFP #57 and
3  Interrogatory #18 by producing documents only as to the Wood
4  Village store.  As to Interrogatory #19, plaintiff states that
5  defendant referred back to its production of documents in response
6  to a previous request, limited only to "employees who were
7  terminated from Store 2729 for the same reason as Plaintiff for the
8  period of January 1, 2006 to December 31, 2008." (Plaintiff
9  provides no copy of defendant's responses).

10  On October 5, 2010, this Court resolved a motion to compel
11  filed by plaintiff, seeking production of records and information
12  extending beyond the single-store location where plaintiff worked.
13  Plaintiff argues that despite the recognition by this Court that
14  defendant's objection to discovery extending beyond the confines of
15  the Wood Village store was not well taken, defendant has failed and
16  refused to disclose documents and to offer a response to
17  plaintiff's interrogatory (she does not specify which one) except
18  as limited to that same store.

19  Thus, she argues that by persisting in its refusal to disclose
20  relevant evidence for all of defendant's Oregon stores,
21  particularly in the face of the order on the motion to compel,
22  defendant has frustrated plaintiff's ability to establish the
23  element of her wage claim showing that she is entitled to the
24  thirty-day penalty in O.R.S. 652.150(1)(a).  Plaintiff argues that
25  defendant's motion should be denied in the absence of complete
26  disclosure regarding all of its Oregon locations as requested by
27  plaintiff's discovery requests.

28  Finally, plaintiff states that defendant fails to demonstrate

48 - FINDINGS & RECOMMENDATION

why it should not be liable for attorney's fees incurred in plaintiff's efforts to collect her unpaid and untimely-paid wages and penalty.  Plaintiff argues that the overall purpose of the wage statute would be frustrated if a violating employer were to escape liability for attorney's fees by responding to an attorney's demand letter, made necessary by O.R.S. 652.150(2), by paying only the amount due to its former employee.

The problem with plaintiff's argument is that she has not accurately represented the nature of the discovery regarding the wage claim.  The discovery regarding plaintiff's wage claim is not the same as the discovery at issue in plaintiff's previously filed motion to compel.  Plaintiff's motion to compel concerned defendant's employees who were disciplined or terminated for violating the break and meal policy.  Plaintiff argued that she was entitled to this information regarding employees beyond the Wood Village store because she believed that the "market human resources manager," meaning someone above the individual store level, had some involvement with plaintiff's mother's accommodation request. In resolving the motion to compel, plaintiff's request was ultimately limited to the specific information requested in Oregon stores in two markets:  476 and 477.

Plaintiff's motion did not seek to compel defendant to produce any information (documentary or response to interrogatories) regarding the discovery requests plaintiff cites here as being relevant to the wage claim.  Here, plaintiff cites to RFP #57 and Interrogatories #18 and #19.  The motion to compel addressed RFP #s 13, 14, 30, 35, 41-43, and Interrogatories #5 and #8.  Thus, plaintiff never moved to compel the information she now complains

49 - FINDINGS & RECOMMENDATION

that defendant did not produce.  Additionally, the motion as to employee records was granted only to the extent that defendant had to produce records of the Oregon stores which were part of two "markets" of defendant's.

Plaintiff should have sought the discovery she needed as to the wage claim before the discovery deadline and if necessary, should have moved to compel production of it.  Granting plaintiff's motion to compel on other requests on the basis that a decision about plaintiff's termination was made by a market level manager did not require defendant to produce information for all Oregon stores for discovery requests not at issue in that motion, especially when there is no evidence that the wage issue required a decision by a market-level manager.

Plaintiff, who concedes that it is her burden to prove a right to the thirty-day penalty in O.R.S. 652.150(1)(a), has failed to meet her burden and thus, defendant is entitled to summary judgment on plaintiff's wage claim because the undisputed evidence in the case record is that defendant paid plaintiff $300 within twelve days of being notified that it had not paid her final wages upon termination, and that this amount is the amount owed plus more than 100% of that amount as a penalty under O.R.S. 652.150(2).  As a result, plaintiff has no claim.

Additionally, I agree with defendant regarding the attorney's fees.  The attorney's fee statute, O.R.S. 652.200(2), provides that

> (2) In any action for the collection of wages, if it is shown that the wages were not paid for a period of 48 hours, excluding Saturdays, Sundays and holidays, after the wages became due and payable, the court shall, upon entering judgment for the plaintiff, include in the judgment, in addition to the costs and disbursements otherwise prescribed by statute, a reasonable sum for

50 - FINDINGS & RECOMMENDATION

attorney fees at trial and on appeal for prosecuting the action, unless it appears that the employee has willfully violated the contract of employment or unless the court finds that the plaintiff's attorney unreasonably failed to give written notice of the wage claim to the employer before filing the action.

O.R.S. 652.200(2).

Here, the language of the statute establishes that the trigger to the right to attorney's fees is the entry of a judgment for the plaintiff on an action for collection of wages.  Wages includes not only the compensation earned and owing, but also the penalties allowed by O.R.S. 652.150.  Wyatt v. Body Imaging, P.C., 163 Or. App. 526, 533-34, 989 P.2d 36, 40-41 (1999) (under O.R.S. 652.150, wages is intended to encompass the penalty wage provided in the statute in addition to the "earned" wages).  Thus, if an employer pays the wages owed after forty-eight hours, but fails to pay any penalties for the late payment as required by O.R.S. 652.150, the plaintiff still has an action for collection of "wages," meaning for the penalties, and may obtain a judgment.  In such a case, the plaintiff would be entitled to attorney's fees under O.R.S. 652.200(2) because the plaintiff brought an action for the penalty wages and if successful, obtained a judgment for the penalty wages. See Id. (O.R.S. 652.200(2) "must be understood to encompass an action for the collection of the penalty wage.").

Here, however, defendant paid the wages and the penalty before plaintiff filed the action.  Without establishing defendant's inability to take advantage of the safe haven of O.R.S. 652.150(2)(a), plaintiff has no claim, and thus, has no judgment for either the wages earned or the penalty wages.  She is not entitled to attorney's fees.  I recommend granting summary judgment

51 - FINDINGS & RECOMMENDATION

1  to defendant on this claim.

2                            CONCLUSION

3        I recommend that defendant's motion for summary judgment [43]

4  be granted as to the wage claim, and denied as to all other claims.

5                          SCHEDULING ORDER

6        The Findings and Recommendation will be referred to a district

7  judge.  Objections, if any, are due May 23, 2011.  If no objections

8  are filed, then the Findings and Recommendation will go under

9  advisement on that date.

10       If objections are filed, then a response is due June 9, 2011.

11 When the response is due or filed, whichever date is earlier, the

12 Findings and Recommendation will go under advisement.

13       IT IS SO ORDERED.

14                    Dated this 3rd  day of May , 2011

15

16                              /s/ Dennis J. Hubel

17                              _____

18                              Dennis James Hubel
                                United States Magistrate Judge

19

20

21

22

23

24

25

26

27

28

52 - FINDINGS & RECOMMENDATION